AO 91 (Rev. 11/11) Criminal Complaint AUSA Tyler C. Murray (312)353-7846
 DOJ Deputy Chief Brian R. Young (202)616-3114

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | |
|---|---|
| v. | CASE NUMBER: |
| RAHUL SHAH | |

**FILED** 6/15/2020 THOMAS G. BRUTON CLERK, U.S. DISTRICT COURT

TD

MAGISTRATE JUDGE VALDEZ
**20CR293**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

### Count One

From on or about April 30, 2020, to on or about May 18, 2020, at Evanston, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1344 | bank fraud |

### Count Two

On or about April 30, 2020, at Evanston, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1014 | false statement to a financial institution |

This criminal complaint is based upon these facts:

 x  Continued on the attached sheet.

 */s/ James Sams*
 JAMES SAMS
 Special Agent
 Treasury Inspector General for Tax Administration

Sworn to and affirmed by telephone
or other reliable electronic means.

Date: June 15, 2020 Maria Valdez
 *Judge's signature*

City and state: Chicago, Illinois Maria Valdez, U.S. Magistrate Judge
 *Printed name and Title*

| UNITED STATES DISTRICT COURT | SS |
|---|---|
| NORTHERN DISTRICT OF ILLINOIS | |

**AFFIDAVIT**

I, James Sams, being duly sworn, state as follows:

**Introduction**

1. I am a Special Agent with the Treasury Inspector General for Tax Administration ("TIGTA"). From 2000 to 2004, I worked as a patrolman for the Tupelo, Mississippi Police Department, where I also served as the Senior Critical Incidents Negotiator and the Report Writing Instructor at the North Mississippi Law Enforcement Training Academy. From 2004 to 2014, I worked as a Special Agent for the United States Secret Service, where I conducted multiple complex, multi-jurisdictional financial crimes investigations. From 2014 to the present, I have been employed with TIGTA, where I have conducted multiple investigations related to fraud, waste, and abuse affecting the Internal Revenue Service ("IRS") and its efforts to successfully complete its tax administration mission.

2. Throughout my career, I have conducted criminal investigations involving money laundering, bank fraud, public corruption, organized crime, and other illegal schemes impacting financial institutions. I have experience conducting search, seizure, and arrest warrant operations. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners to investigate fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 pandemic.

3. This affidavit is made in support of a criminal complaint charging Rahul Shah with engaging in a scheme to defraud and to obtain money from a financial institution through false

1

representations, in violation of 18 U.S.C. § 1344, and making a false statement to a financial institution, in violation of 18 U.S.C. § 1014.

4. This affidavit is based on my investigation and investigation by other law enforcement officials. The facts contained herein have been obtained by interviewing witnesses and examining documents obtained in the course of the investigation. This affidavit does not include every fact known to me about this investigation, but rather only the facts that I believe are necessary to establish probable cause that the defendant committed the offenses alleged in the complaint.

### Summary of the Offenses and Facts Establishing Probable Cause

*The Paycheck Protection Program*

5. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic. One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the Paycheck Protection Program ("PPP"). In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

6. In order to obtain a PPP loan, a business must submit a PPP loan application (SBA Form 2483), which is signed by an authorized representative of the business. The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and to make certain affirmative certifications regarding its eligibility. In the application, the small business's authorized representative must also provide, among other things, the business's: (a) average monthly payroll expenses; and (b) number of employees. These figures

are used to calculate the business's eligibility and the amount of money it may receive under the PPP. In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

7. A PPP loan application must be processed by a participating lending financial institution. If a PPP loan application is approved by the participating financial institution, that institution funds the PPP loan using its own monies, which are 100% guaranteed by the Small Business Administration ("SBA"). Participating financial institutions require that the information provided in PPP loan applications be truthful, including information about the applicant business's employees and payroll expenses, which is material to the financial institutions' approval and the terms of PPP loans.

8. Information from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lending financial institution to the SBA in the course of processing the loan.

9. PPP loan proceeds must be used by the business for certain permissible expenses—payroll costs, interest on mortgages, rent, and utilities. The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these items within a designated period of time (usually within twenty-four weeks of receiving the proceeds) and uses at least 60% of the PPP loan proceeds for payroll expenses.

*Relevant Individuals and Entities*

10. Rahul Shah ("Shah") and his wife, Individual A, are residents of Evanston, Illinois.

11. According to records maintained by the Illinois Secretary of State, N2N Holdings, LLC ("N2N") is a Limited Liability Company with a principal place of business on Davis Street in Evanston, Illinois (the "Davis Street Address"). These records indicate that N2N does business

3

under the name Boardshare. Individual A is identified as the manager of N2N.

12. According to records maintained by the Illinois Secretary of State, Katalyst Technologies, Inc. ("Katalyst") is a domestic corporation. Shah is identified as the corporation's agent with an address at the Davis Street Address. Shah is also identified as the President and Secretary. Records maintained by the Georgia Secretary of State indicate that Katalyst is also registered in Georgia. According to filings in Georgia, Katalyst is a Foreign Profit Corporation which lists the Davis Street Address as its principal office. Shah is identified as the Chief Executive Officer, Chief Financial Officer, and Secretary.

13. On or about May 29, 2020, and on or about June 5, 2020, I conducted surveillance on the Davis Street Address, which is a commercial office building. The offices of Katalyst and Boardshare (N2N's "doing business as" name) are on the seventh floor of that building. Both companies share the same entrance and lobby. I was able to see the lobby through a glass door and I observed signs for Katalyst and Boardshare on the walls. Through a glass door at the employee entrance, I was able to view the office space and observed desks and office equipment. I did not see anyone inside the office space on either of the days I was there.

14. According to records maintained by the Illinois Secretary of State, Codesoft International, Inc. ("Codesoft") is a corporation with its place of business in Atlanta, Georgia. Shah is identified as the corporation's President. The Illinois Secretary of State identifies Codesoft's status as "revoked." According to information maintained by the Georgia Secretary of State, Codesoft was incorporated in Georgia in 1989 with its principal place of business in Johns Creek, Georgia. Individual A is identified as the Chief Executive Officer, Chief Financial Officer, and Secretary of Codesoft.

4

*PPP Loan Application to Bank A*

15. On or about April 30, 2020, Bank A, a federally-insured financial institution headquartered in Pittsburgh, Pennsylvania, received a PPP loan application for a $441,138 loan to N2N. The application, which bears the signature of Individual A, represents that N2N has ten employees and an average monthly payroll of $176,455. Individual A is identified as a 100% owner of the company. The business phone number disclosed on the application is xxx-xxx-8575 (the "8575 number"), and the email address provided is rshah@katalysttech.com.

16. With the N2N application, Bank A received multiple IRS forms that purport to document N2N's payroll expenses. As set forth below, records maintained by the IRS as well as interviews with individuals whom N2N held out as being employed by N2N establish that some of these accompanying documents are false.

17. Bank A received three IRS Forms 941 that purport to report N2N's payroll expenditures for the second, third, and fourth quarters of 2019.[1] All three documents are signed by Shah, who is identified as N2N's Chief Executive Officer.[2] The Forms 941 report that N2N paid wages, tips, and compensation in the amount of $50,062 in the second quarter of 2019, $157,041 in the third quarter of 2019, and $218,875 in the fourth quarter of 2019, respectively. However, tax filing records maintained by the IRS demonstrate that, based on the Forms 941 submitted to the IRS by N2N, it paid average monthly wages, tips, and compensation in the amount

---

[1] Employers file IRS Forms 941 to report quarterly payroll expenditures.

[2] On or about April 15, 2020, Bank B, a federally-insured financial institution in Wallis, Texas, received an application for a PPP loan for Katalyst. The application, which represented that the company had a monthly payroll of $845,285, identified Shah as the President and 42% owner of the company. The second page of the application contains Shah's notarized signature. A lay comparison between the signature on the IRS Forms 941 that Bank A received and the notarized signature on the application that Bank B received reveals that the signatures appear to be written by the same person. For this additional reason, I believe that Shah signed the IRS Forms 941. In addition, during an interview conducted on or about May 29, 2020 (see paragraphs 21 and 22 below), Shah acknowledged to agents that he signed the IRS Forms 941 submitted to Bank A.

5

of $6,886 in the second quarter of 2019, $2,493 in the third quarter of 2019, and $0 in the fourth quarter of 2019. IRS records also show total reported W-2 employee compensation for N2N in 2019 as $48,870.[3]

18. Bank A also received false IRS Forms 1099-MISC in support of the loan application, including the following:

a. Bank A received what purports to be an IRS Form 1099-MISC reporting that in 2019 N2N paid $68,715 in compensation to Individual B of Vernon Hills, Illinois.[4] When interviewed, Individual B told agents that she never worked for N2N Holdings, that she did not earn $68,715 from that company, and that she never received a Form 1099-MISC from N2N. The false Form 1099-MISC submitted in Individual B's name contains her actual social security number. Individual B told agents that she worked for Katalyst Technologies from 2015 to 2017 and that Shah owned the company during this period. The IRS has no record of receiving this Form 1099-MISC.

b. Bank A received what purports to be an IRS Form 1099-MISC reporting that in 2019 N2N paid $98,300 in compensation to Individual C of Sugar Land, Texas. When interviewed, Individual C told agents that he never worked for N2N Holdings, that he did not earn $98,300 from that company, and that he never received a Form 1099-MISC from N2N. The false Form 1099-MISC submitted in Individual C's name contains his actual social security number. Individual C told agents that he worked for Katalyst Technologies from 2012 to 2015 and that Shah was the Chief Executive Officer during this period. The IRS has no record of receiving this Form 1099-MISC.

---

[3] Although two of the three Forms 941 that were submitted to Bank A purport to be signed by Shah in 2019, the submitted forms are for 2020 reporting and note on their face that they were revised by the IRS in January 2020.
[4] Employers file IRS Forms 1099-MISC to report various expenditures, including nonemployee compensation.

c. Bank A received what purports to be an IRS Form 1099-MISC reporting that in 2019 N2N paid $83,430 in compensation to Individual D of St. Louis, Missouri. When interviewed, Individual D told agents that he never worked for N2N Holdings, that he did not earn $83,430 from that company, and that he never received a Form 1099-MISC from N2N. The false Form 1099-MISC submitted in Individual D's name contains his actual social security number. Individual D told investigators that he worked for Katalyst Technologies from 2012 to 2016 or 2017 and that Shah was the Chief Executive Officer during this period. Individual D stated that Individual A worked in the Human Resources Department of Katalyst. The IRS has no record of receiving this Form 1099-MISC.

19. After some back-and-forth between a Bank A representative and Shah regarding N2N's loan application, on or about May 18, 2020, Shah stated in a text message to the Bank A representative that "the new total using all 2019 941 comes to $99k."[5] Shah's statement, which I understand to refer to N2N's average monthly payroll costs (excluding payments to nonemployees reflected on 1099-MISCs) in 2019 as reported on IRS Forms 941, is false. IRS records, based on Forms 941 submitted by N2N, reflect average monthly payrolls in 2019 as follows: $6,911 for the first quarter; $6,886 for the second quarter; $2,493 for the third quarter; and $0 for the fourth quarter.

20. Ultimately, Bank A declined to approve N2N's loan application and did not fund a PPP loan for N2N.

---

[5] In an interview with law enforcement agents on or about May 29, 2020 (see paragraphs 21 and 22 below), Shah indicated that after initially telling him otherwise, Bank A advised him that compensation paid to nonemployees as reflected on IRS Forms 1099-MISC did not qualify as payroll costs for purposes of a PPP loan application.

***Rahul Shah's Statements to Law Enforcement Agents***

21. On or about May 29, 2020, TIGTA and FBI agents spoke with Shah at his home and recorded the conversation.

22. In sum and substance, Shah relayed the following during the interview:

   a. Shah stated he is the President of N2N and that Individual A, who owns the company, performs "back office" functions.

   b. Shah said that he and Individual A manage N2N, Codesoft, and Katalyst. Although the latter two entities use a commercial payroll processor, N2N does not, and instead does that company's payroll "in house." Shah clarified that Individual A did not have responsibility for creating payroll documentation.

   c. Shah explained that N2N is "independent" from Codesoft and Katalyst and that there is "no relationship" between N2N and these two entities.

   d. When asked whether N2N applied for a PPP loan, Shah replied, "we did, online."

   e. When asked whether he received any assistance in preparing the N2N PPP loan application, Shah responded, "No."

   f. After agents stated that the IRS Forms 1099-MISC and 941 that were submitted with the application appeared to contain false statements, Shah said that he knew that there were "errors" in the documentation.

   g. Initially, Shah stated that the Forms 1099-MISC and 941s that were submitted with N2N's PPP loan application were supplied by employees in India. When asked how he received the payroll documentation from N2N's Indian employees, Shah responded that he received it by email.

      h.      At several points during the interview, agents challenged the veracity of Shah's assertion that he received the tax forms from employees in India. When asked if he could produce an email that the Indian employees used to transmit the tax documentation, Shah said "I don't have an email." An agent said, "what I'm gathering is that this likely didn't come from India –these 1099s – because the email account is not going to reflect that," and Shah responded, "right, right, right." Agents then asked, "[s]o these [Forms 1099-MISC] were prepared here [in the United States]?" to which Shah replied, "probably, yeah." When asked, "[y]ou all prepared [the Forms 1099-MISC], not somebody in India, and submitted it thinking 'it will keep our business alive' . . . is that an accurate way to put things?" Shah responded, "I would say so, yes."

      i.      When asked for his cell phone number, Shah provided the 8575 number.

## Conclusion

23.      Based on the foregoing, I respectfully submit that there is probable cause to believe that Rahul Shah, within the Northern District of Illinois, committed violations of 18 U.S.C. § 1344 (bank fraud) and 18 U.S.C. § 1014 (false statement to a financial institution).

Further affiant sayeth not.

                                                                   */s/ James Sams*
                                                                   Special Agent James Sams
                                                                   Treasury Inspector General for Tax Administration

Sworn to and affirmed by telephone
or other reliable electronic means
this 15th day of June, 2020

*Maria Valdez*
_____
Honorable Maria Valdez
United States Magistrate Judge