# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 20-cr-293-1 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| RAHUL SHAH. ) | |

## MEMORANDUM OPINION AND ORDER

A grand jury issued an indictment charging Defendant Rahul Shah with one count of bank fraud in violation of 18 U.S.C. § 1344, three counts of making false statements in violation of 18 U.S.C. § 1014, and one count of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1).[1] [48.] Currently before the Court is Defendant's motion to suppress certain statements that he made to investigators at his home in May 2020. [97.] In addition to reviewing the parties' briefs, the Court heard oral argument from counsel on this motion. [145.] For the reasons stated below, the Court denies Defendant's motion. [97.]

## I. Background[2]

Defendant is the Chief Executive Officer of N2N Holdings, LLC ("N2N"). [92, 97.] On April 5, 2020, N2N applied for a Paycheck Protection Program ("PPP") Small Business Administration ("SBA") loan for financial support during the COVID-19 pandemic. [92.] On May 29, 2020, two special agents from the Federal Bureau of Investigation ("FBI") and two special agents from the Office of Treasury Inspector General Tax Administration ("TIGTA") arrived at Defendant's home to interview him regarding N2N's loan application. [97-1, at 1.] Those agents included FBI Special Agent Todd Panfil, FBI Special Agent Lisa Schmadtke, TIGTA Special

---

[1] The Court recognizes that the government filed a superseding indictment on May 23, 2022. [129.] Nevertheless, counsel agreed that this motion is ripe for ruling.
[2] The parties dispute various facts relating to the encounter between Defendant and law enforcement agents on May 29, 2020. [97, 107, 119.] The Court notes the parties' differing views of the facts below.

Agent James Sams, and TIGTA Special Agent Charles Baxter. [99, at 1.] The Government and Defendant dispute what occurred before Defendant invited agents into his home.

According to the Government, when the agents arrived at Defendant's home, Defendant answered the door and Special Agents Sams and Panfil identified themselves. [99, at 1.] The agents indicated that they would like to talk to Defendant about his PPP SBA loans. [*Id.*] Per the Government's account, Defendant immediately admitted that the N2N loan application had mistakes and stated that he had since withdrawn it. [*Id.*] Special Agent Sams then requested to come into Defendant's home to discuss the loans and gave him the option to speak outside due to the risk of COVID-19. [*Id.*] Defendant asked agents if he would need his attorneys present for the conversation and Special Agent Sams indicated that Defendant was welcome to have his attorneys present. [*Id.*] Rather than contact his attorney at that time, Defendant noted that his attorneys were not present, but he would still talk with agents and invited them into his home. [*Id.*]

According to Defendant, when agents arrived, he declined to speak to them and indicated that he would prefer to speak to them with his attorney present. [97-1, at 1.] The agents indicated that they only had a few questions to ask Defendant and that their conversation would only take "a few minutes." [*Id.*] Defendant continued to insist that he would "prefer" to have his attorney present for their conversation. [*Id.*] Rather than leave, agents offered to speak outside if Defendant was not comfortable speaking with them inside due to the risk of COVID-19 and indicated that they wanted to talk about N2N's loan application, which Defendant admitted to withdrawing. [*Id.*] Defendant maintained that he would prefer to speak with agents with his attorney present "at least" four times. [*Id.*] Eventually, Defendant let them into his home as, he "did not feel like [he] had a choice." [*Id.*] Defendant argues that he "only spoke with them because [he] was intimidated when they did not leave [his] house and [he] felt that [he] had no other choice." [*Id.*] According to

2

Defendant, agents did not inform him that he could refuse to speak with them, that he could ask them to stop talking to them, that he was under investigation for a crime, or of his constitutional rights. [*Id.*]

After the agents entered Defendant's home, they began to record their conversation with Defendant.[3] [99, at 1; Tr. 2–3, at 01:09–01:15.] The conversation lasted approximately an hour and focused on the N2N loan application. [Tr. 1–64, at 00:00–58:20.] At the beginning of the recording, Special Agent Sams informed Defendant that "[i]f there's something [he didn't] want to talk about, [the agents] can wait and have * * * an attorney present." [Tr. 1, at 00:01–00:03.] In response, Defendant told the agents that the N2N loan application had errors and had been since retracted. [Tr. 1, at 00:03–00:06.]

Throughout the conversation, Defendant reiterated several times that information within the N2N loan application was a "mistake" or "error," including whether more than one person had an ownership stake in N2N, whether it was an LLC or C corporation, how many employees N2N employed, when and how long those employees worked for N2N, and various information included in their employment forms. [See Tr. 1, at 00:03–00:06; Tr. 1–2, at 00:18–00:23; Tr. 12, at 08:34–09:32; Tr. 17, at 14:59–15:05; Tr. 21, at 18:20–18:27; Tr. 27, at 23:20–23:25; Tr. 34, at 31:15–31:36; Tr. 36, at 32:21–32:25; Tr. 51–52, at 46:55–48:12.] Defendant twice stated that he did not intend to defraud the government. [Tr. 24, at 20:57–21:10; Tr. 53, at 48:28–48:35.] Defendant also denied that any documents were "forged or anything." [Tr. 52, at 48:05–48:10.]

After discussing Defendant's knowledge of N2N's payroll practices, Special Agent Sams noted that the mistakes that Defendant was acknowledging were "very obvious." [Tr. 51, at 45:57–

---

[3] The agents used two recorders but one malfunctioned. [99, at 1.] As such, there is only recording of the conversation between Defendant and the agents that begins after the agents come into Defendant's home. The Court utilizes the transcript of the recorded conversation submitted by the Government, including corresponding page numbers and time stamps. [See Tr. 1–64.]

46:09.] In discussing who created employees' 1099 forms, the following interaction between Special Agent Sams and Defendant occurred:

> SAMS: I mean, and if it– if it didn't come from India, ya know, it would be better to just say, you know, um, I screwed this up and I should have not done that 'cause I know you
> SHAH: We don't
> SAMS: Don't wanna get caught with–
> SHAH: No, I– I know– I'll take full responsibility for it, even if it's India. Buck stops with me. I should have checked it and I should have done it. I know a lot of our work gets done out of our India team and I, you know, I– I would not say that uh, they should be held responsible. It's my– it's my responsibility. I should have checked. I know– we do have, um, uh people that work on 1099s for us, both companies, all three companies.
> SAMS: Yeah.
> SHAH: So, yeah. Um, and we did ask for all this information but PNS is what we can do with
> SAMS: Yeah
> SHAH: And Codesoft also, N2N, Catalyst and each bank has its own rules
> SAMS: Yeah.
> SHAH: I mean, we applied PPP for Catalyst through um, Chase as well. And they said you could put your healthcate [sic] insurance and all that data and we provided that. And then the other banks said no, we're not allowed to do that. And so, I think there was a lot of confusion and N2N, yeah– I think we were trying to get the money out
> SAMS: Yeah
> SHAH: But I– I think the first go we asked for all this information and we realized that it was a mistake and we pulled everything out, so.
> SCHMADTKE: So did you instruct somebody at– in India to create those?
> SHAH: No.
> SCHMADTKE: Okay.
> SHAH: No, I didn't creat– [sic] no, none of this will be
> SCHMADTKE: Okay
> SHAH: Forged or anything. That's one thing I can tell you. There will be honest mistakes like there will be in any other businesses

[Tr. 51–52, at 46:40–48:12.] Special Agent Sams and Defendant further discussed that process in the following interaction:

> SAMS: So what I'm gathering is this likely didn't come from India? These 1099s because the– the email account is not going to reflect that
> SHAH: Right, right, right.
> SAMS: So these were prepared here?
> SHAH: Probably yeah, or they were prepared in India–
> SAMS: What I'm trying to avoid is, I don't want you to get stuck
> SHAH: Right
> SAMS: Like I don't think where somebody says, well he lied about that. I don't want that–

4

> SHAH: Right, right.
> SAMS: To happen to you so– you all prepared it
> SHAH: Yeah.
> SAMS: Not somebody in India
> SHAH: Right, right.
> SAMS: And submitted it thinking well it will keep our business alive–
> SHAH: Right, right
> SAMS: And I understand that
> SHAH: Right
> SAMS: It's a desperate time
> SHAH: Right, right.
> SAMS: People make mistakes and they make decisions that aren't necessarily ethical or legal, but they're trying their best
> SHAH: Right, right.
> SAMS: To stay alive.
> SHAH: Right.
> SAMS: And I get that. And I'm not here
> SHAH: Right
> SAMS: To condemn that,
> SHAH: Right.
> SAMS: Is that an accurate–
> SHAH: I would say so, yeah.

[Tr. 53–54, at 49:35–50:16.] After agents talked with Defendant about his business and Defendant mentioned the possibility of loan forgiveness, the agents left Defendant's home without arresting him. [Tr. 55–64, at 51:55–58:20.]

On December 20, 2021, Defendant moved to suppress his statements. [29.] Specifically, Defendant moves to suppress his statements in conversation with agents because (1) agents failed to read Defendant his *Miranda* rights when he was in custody at his home, and (2) even if Defendant was not in custody, his statements were involuntary and, therefore, taken in violation of due process. [*Id.*] The government responded to Defendant's motion on January 31, 2022 [107], and on February 28, 2022, Defendant submitted a reply [119]. On August 2, 2022, the Court heard oral argument from counsel on this motion. [145.]

## II. Legal Standard

### A. *Miranda* Warnings

5

The Fifth Amendment protects individuals from self-incrimination. U.S. CONST. amend. V. Before conducting a custodial interrogation, law enforcement must inform suspects of their constitutional right to remain silent and to have counsel present, known as *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *United States v. Jackson*, 189 F.3d 502, 510 (7th Cir. 1999). However, law enforcement need not provide *Miranda* warnings unless the suspect is both "interrogated" and "in custody." *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980); *Jackson*, 189 F.3d at 510.

To establish that a suspect was in custody, a defendant must show that he was either "formally arrested" or "subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained." *United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016) (cleaned up and citation omitted). "An individual free to end the interrogation and leave is not in custody." *United States v. Higgins-Vogt*, 911 F.3d 814, 820 (7th Cir. 2018) (citing *Howes v. Fields*, 565 U.S. 450, 509 (2012)). To answer whether a defendant is in custody, the Court asks "whether, in light of the objective circumstances of the interrogation, a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave." *Howes*, 565 U.S. at 509 (cleaned up and citations omitted); see also *Stechauner v. Smith*, 852 F.3d 708, 715 (7th Cir. 2017). The subjective beliefs of both "the interrogating officer[]" and "the person being questioned" are irrelevant determining whether a suspect is in custody for *Miranda* purposes. *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam); see also *Stechauner*, 852 F.3d at 715.

"Relevant factors include the location of the questioning, its duration, statements made during the interrogation, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of questioning." *Howes*, 565 U.S. at 509 (citations

6

omitted). The Seventh Circuit has additionally noted that a court can consider "whether: (1) the encounter occurred in a public place; (2) the suspect consented to speak with officers; (3) the officers informed the suspect that he was not under arrest; (4) the [suspect was] moved to another area; (5) there was a threatening presence of several officers and a display of weapons or physical force; (6) the officers deprived the suspect of documents needed to depart; and (7) the officers' tone was such that their requests were likely to be obeyed." *United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012).

### B. Involuntary Statements in Violation of Due Process

The use of police coercion to extract an involuntary statement is a violation of due process under the Fourteenth Amendment. See *Schneckloth v. Bustamonte*, 412 U.S. 218, 223–26 (1973); *United States v. Stadfeld*, 689 F.3d 705, 709–10 (7th Cir. 2012). "[A] confession is voluntary if, in the totality of circumstances, it is the product of rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will." *United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004) (cleaned up and citation omitted). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Gillaum*, 372 F.3d at 856. The Court "analyze[s] coercion from the perspective of a reasonable person in the position of the suspect," and should "consider the following factors: the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *United States v. Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015) (cleaned up and citation omitted).

**III.    Analysis**

    **A.  *Miranda* Warnings and Custodial Interrogation**

The first issue for decision is whether Defendant was in custody when federal agents interviewed him at his home on May 29, 2020.[4] Because Defendant was not formally arrested, the Court must utilize the "restraints of freedom" analysis to determine whether a reasonable person in Defendant's position would have believed he was free to leave. *Patterson*, 826 F.3d at 455. Even crediting Defendant's version of events, the Court finds that Defendant was not in custody when agents questioned him, as a reasonable person would feel have felt to leave or, more likely, to ask the agents to terminate the interview and leave his house.

    **1.  Location of Questioning**

The parties agree that Defendant was questioned at home in a private space, without being moved to another location, which generally weighs against finding that Defendant was in custody. [97, 107.] The Court agrees with this analysis. See *Beckwith v. United States*, 425 U.S. 341, 342–43 (1976) (finding an interrogation in the defendant's home to be non-custodial); *United States v. Slaight*, 620 F.3d 816, 820 (7th Cir. 2010) (noting that police officers were careful not to question the defendant at his home because "he would be in familiar surroundings and feel less compulsion to answer questions put to him"); *United States v. Borostowski*, 775 F.3d 851, 862 (7th Cir. 2014) (observing that an interrogation at home "generally weighs in favor of finding that [the defendant] was not in custody"); but see *Orozco v. Texas,* 394 U.S. 324, 325–27 (1969) (finding that a defendant questioned at home was in custody for *Miranda* purposes); *Sprosty v. Buchler*, 79 F.3d

---

[4] The government does not dispute that Defendant was being interrogated when law enforcement agents interviewed him on May 29, 2020. [107, at 6 n.4.] As such, the Court focuses on the question of whether Defendant was in custody.

8

635, 641–42 (7th Cir. 1996) (observing that "the familiarity of the surroundings in which a detention takes place is not alone dispositive" in finding that a defendant was in custody).

Nonetheless, Defendant argues that even though agents questioned him at his home, he was in custody because agents did not leave when Defendant informed them that he would not speak with him and would prefer to have his attorney present; rather than honor Defendant's preferences, agents "insisted," explaining that the interview would only be "a few questions, until [Defendant] relented." [97, at 6.] Defendant compares his interview with cases in which various courts have held that the defendant was in custody while being questioned in his or her home. [*Id.*] As explained below, the Court finds these cases distinguishable. In addition to questioning Defendant in the familiar atmosphere of his home, agents did not so thoroughly "dominate[]" Defendant's home as to render the interview custodial. *Sprosty*, 79 F.3d at 641.

In the cases that Defendant cites, law enforcement officers arrived at the suspect's home in an overwhelming "show of force," with multiple officers, often armed or wearing military-style equipment. See *Borostowski*, 775 F.3d at 860–61 (holding that defendant was in custody when seven armed police officers, one carrying a ballistic shield, roused defendant from sleep, ordered him to place him hands on his head, and physically pulled him from his home to restrain him); *Slaight*, 620 F.3d at 820 (holding that defendant was in custody when nine police officers entered defendant's home, visibly armed and with a battering ram, found defendant naked, and ordered him, with guns pointed at him, to put his hands up); *United States v. Craighead*, 539 F.3d 1073, 1084–85 (9th Cir. 2008) (holding that defendant was in custody when eight armed police officers, representing three different law enforcement agencies, entered his home, some with protective gear and unholstered guns); *United States v. Mittel–Carey*, 493 F.3d 36, 38–40 (1st Cir. 2007) (holding that defendant was in custody when eight police officers, one with an unholstered gun,

9

entered the defendant's home in the early hours of the morning to awaken defendant to question him); *United States v. Revels*, 510 F.3d 1269, 1275–76 (10th Cir. 2007) (holding that defendant was in custody when officers forcibly breached her front door, handcuffed her, and placed her prone on the floor to search her home).

These cases stand in stark contrast to the present case. Only four officers came to Defendant's home and proceeded to ask his permission for entrance. None had visible weapons or military-style gear. The agents did not come to question Defendant at an early hour or use physical force to gain entrance to Defendant's home; all were let in with Defendant's apparent permission. Even crediting Defendant's affidavit and resolving all disputed facts about the encounter in his favor, the facts of the cases cited above are far afield from those in cited by Defendant. As the Government suggests, a closer comparator is *United States v. Thompson*, 496 F.3d 807 (7th Cir. 2007). Crediting Defendant's account, like the defendant in *Thompson*, Defendant eventually "invited" agents into his home, albeit after agents asked him more than once. [97-1, at 1.]

In essence, Defendant argues that agents put him in custody by failing to honor his refusal to speak with them and his stated preference to have his attorney present. [97, at 6–7.] While it appears that Defendant would have preferred not to speak with agents, by both parties' accounts, the agents did not threaten Defendant with physical force, intimidation, or threats if he failed to speak with them. [97-1; 99.] Rather, agents offered to speak outside and noted that "[i]f there's something [he didn't] want to talk about, [the agents] can wait and have * * * an attorney present." [Tr. 1, at 00:01–00:03.] Defendant cannot cite to a comparable case where law enforcement officers' persistence without use of physical force, threat, or intimidation still rendered an interrogation at home custodial. [97.] As such, the Court concludes that the location and absence

10

of "domination" of Defendant's home by agents weigh against a finding that Defendant was in custody.

## 2. Duration

Defendant argues that because he was advised that the interview would be "only * * * a few minutes" and ended up lasting an hour, the interview's duration indicates that he was in custody [97, at 7; 97-1, at 1.] The Government counters that the one-hour duration was "substantially shorter than the length of other residential interviews which controlling authorities deemed non-custodial" and thus weighs against a finding that the interview was custodial. [107, at 8.] The Court concludes that the duration of Defendant's interview slightly weighs in favor of finding that Defendant was in custody.[5]

Caselaw indicates that even shorter interviews can be considered custodial when officers are asking questions in an attempt to elicit incriminating statements. See *Slaight*, 620 F.3d at 819; compare *Borostowski*, 775 F.3d at 861 (finding an over three-hour interview to be custodial); and *Howes,* 565 U.S. at 515 (finding a five-to-seven-hour interview to be custodial); and *Mittel-Carey*, 493 F.3d at 39–40 (finding a ninety-minute to two hour interview to be custodial); with *Yarborough,* 541 U.S. at 661 (finding a half-hour interview to be non-custodial); *Beckwith,* 425 U.S. at 347–48 (finding that a "relaxed," three-hour interview in suspect's home was non-custodial).

Turning to the specific circumstances here, there is no indication in the recording that agents were attempting to extend the interview. Although the Court accords little weight to the Defendant extending the interview by six minutes, Defendant's apparent comfort in speaking to

---

[5] The Court notes that contrary to Government's contention that "a considerable portion of the hour was spent on small talk" [107, at 8], the recording indicates that Defendant talked with agents for about six minutes after they indicated a willingness to leave [Tr. 55–64, at 50:17–57:38].

agents by doing so is indicative that he was not put out by the duration of the encounter. At the same time, agents ask repeated questions over the course of an hour concerning specific details of N2N's loan application and certainly seemed to want Defendant to incriminate himself. [See generally Tr. 3–55, 01:12–50:53.] On the whole, the Court finds that the interview's duration slightly supports a finding that Defendant was in custody.

### 3. Statements Made During the Interview

Defendant argues that the "purpose" of the interview was to "elicit a confession," which renders the interview custodial. [97, at 7.] Defendant points to agents' statements that there was "no loss" from N2N's loan application and Special Agent Sams's statement that "it would be better to just say * * * I screwed this up and I should not [have] done that" to argue that "agents made multiple statements to downplay the seriousness of the situation and imply that the investigation would end if he took responsibility as the CEO of the company." [119, at 4.]

Defendant's argument fails for several reasons. First, as mentioned above, the subjective beliefs of "the interrogating officer[]" are irrelevant. *Stansbury*, 511 U.S. at 323. Defendant implies that agents had a subjective intent to elicit a confession. [97, at 7.] Any such intent is immaterial. Second, Defendant suggests that agents are not allowed to use various interrogation tactics, like understatement or misdirection, to question him. Not so. Law enforcement "are allowed to play on a suspect's ignorance, his anxieties, his fears, and his uncertainties," just as long as law enforcement's tactics do not make "rational decision * * * impossible." *United States v. Mizyed*, 927 F.2d 979, 982 (7th Cir. 1991) (citation omitted). In a comparable case, the Seventh Circuit found that law enforcement's offer to "clear [the defendant's] name" was not a "ruse" that "negated a suspect's volition." *Patterson*, 826 F.3d at 456. Rather, "a reasonable person in [the defendant's] shoes would have or should have known that any ensuing discussion or interview

12

would be about the FBI investigation and [the defendant's] involvement in the subject of the investigation." *Id.*

The same is true here. A reasonable person in Defendant's position would understand that federal agents asking about a federal loan with "very obvious" mistakes, questioning him about specific details of his employees' work history, and invoking the input of the U.S. Attorney were asking about a potential criminal investigation. Indeed, Defendant seemed to understand this, evidenced by his multiple statements that he had no intent to defraud the government [Tr. 24, at 20:57–21:10; Tr. 53, at 48:28–48:35] and his disclaimer that he forged any documents [Tr. 52, at 48:05–48:10.] As such, Defendant's arguments miss the mark. The statements made during the interview weigh against finding that Defendant was in custody.

### 4. Remaining Factors

As to what remains, most factors weigh against a determination that Defendant was in custody. The parties agree that the agents' tone was relatively polite, that agents did not threaten Defendants with weapons or use physical force, that agents did not place Defendant under formal arrest, and that Defendant was released at the end of the interview.[6] *Ambrose*, 668 F.3d at 956. These factors weigh against a finding that Defendant was in custody. On the other hand, the officers did not inform Defendant that he was not under arrest. *Id.* This factor weighs for a finding of custody.

Finally, crediting Defendant's version of events, Defendant only consented to speak with agents after they insisted multiple times that they speak with him. Compare with *Ambrose*, 668 F.3d at 956 ("Where a person voluntarily agrees to meet with law enforcement agents, that weighs against a finding that the person could reasonably believe he is in custody."). Notwithstanding

---

[6] The Court does not comment on whether Defendant was deprived of any documents he needed to depart, as both parties do not argue this factor in briefing. *Ambrose,* 668 F.3d at 956.

13

agents' failure to comply with Defendant's wishes [97-1, at 1], for his part, Defendant failed to terminate the interview. Compare *United States v. Madoch*, 149 F.3d 596, 601 (7th Cir. 1998) (finding that the district court was wrong to hold that a reasonable person would feel free to leave because the suspect served the agents food in the kitchen and was permitted to tend to her children, when agents did not allow her to do so alone); with *United States v. Bush*, 820 F.2d 858, 859 (7th Cir. 1987) (holding that defendant was not in custody when he was free to ask agents to leave his home or himself walk away). While agents did repeatedly ask to speak with Defendant, once again, persistence in asking does not necessarily render a conversation custodial. Defendant even concedes that he eventually "invited" officers inside his home. [97-1, at 1.] Further, as the government points out [107, at 8], Defendant even continued to speak with officers after they indicated a willingness to leave. [Tr. 55–64, at 50:17–57:38.] On balance, this factor weighs against a finding that the interview was custodial.

Ultimately, balancing the aforementioned factors and accepting Defendant's version of how the interview unfolded, most factors weigh against finding that Defendant was in custody.[7] As such, the Court holds that Defendant was not in custody when agents questioned him at his home in May of 2020.

### B. Involuntary Statements in Violation of Due Process

Even if Defendant was not in custody at the time that agents interviewed him, Defendant further contends that agents coerced him into making inculpatory statements such that his statements were involuntary and thus violative of due process. [97, at 8–12.] Defendant recognizes that, at the time of the interview, he was an intelligent adult with a high level of

---

[7] While Defendant argues that "while Mr. Shah was never informed of his right to counsel, he did invoke that right, and the agents refused to honor it" in his opening brief [97, at 8], he recognizes in his reply brief that if the Court determines that he was not in custody, his argument fails [119, at 4–5]. See *United States v. Littledale*, 652 F.3d 698, 701 (7th Cir. 2011).

education, and agents did not physically punish him in their interview with him. [*Id.*, at 9]; see *Sturdivant*, 796 F.3d at 695. The Court agrees and instead focuses its analysis on the remaining factors, including the length of Defendant's detention, the nature of the interrogation, and the inclusion of advice about constitutional rights. *Id.*

Defendant argues that agents coerced him to give an inculpatory statement because they (1) failed to inform Defendant about his right to counsel, (2) failed to deliver a *Miranda* warning and advise him that he could decline to speak with them, and (3) used various coercive interrogation techniques, including implying that he was not being criminally investigated and confronting him with evidence that Defendant had lied. [97, at 9.]; see also *Dickerson v. United States*, 530 U.S. 428, 444 (2000) (citation omitted) (noting that only in "rare" situations can a defendant prove that his statements were involuntary when law enforcement adhered to *Miranda* requirements).

At the outset of this discussion, even crediting Defendant's account that he expressed a preference for an attorney "at least four times" on his front porch, the record undercuts his argument that agents entirely failed to advise him of his right to counsel. [97-1, at 1.] At the outset of the recording, Special Agent Sams informed Defendant that "[i]f there's something [he didn't] want to talk about, [the agents] can wait and have * * * an attorney present." [Tr. 1, at 00:01–00:03.] Defendant's earlier statements that he would "prefer" to talk to agents with his attorney present does not undermine that agents affirmatively told him they could wait and have his attorney present. Indeed, rather than accepting agents' offer to wait and first seek legal counsel, in response, Defendant told the agents that N2N's loan application was submitted in error and had been since retracted. [Tr. 1, at 00:03–00:06.]

15

Given the context of agents' conversation with Defendant, agents' failure to deliver *Miranda* warnings and advise Defendant that he could decline to speak with them does not indicate that the interview was coercive. As discussed above, the agents were under no obligation to deliver *Miranda* warnings, as Defendant was not in custody. See *Littledale*, 652 F.3d at 701. Further, the agents' failure to inform Defendant that he could decline to speak with them, while significant, is less important given the context of this case. In his affidavit, Defendant notes that he declined to speak with agents. [97-1, at 1.] Accordingly, the agents' failure to affirmatively inform Defendant that he need not speak with them is of lesser importance, as he initially exercised that privilege.

Finally, Defendant's argument that agents "misled [him] towards statements that [the government] now intend[s] to use against him by framing their purpose as 'closing the books' on an error, not as an ongoing criminal investigation into [Defendant's] alleged fraud in violation of federal law" falls short. [97, at 9.] None of interrogation techniques that Defendant points to as potentially coercive overcame Defendant's free will. *Gillaum,* 372 F.3d at 856.[8] The Seventh Circuit has "repeatedly held that a law-enforcement agent may actively mislead a defendant in order to obtain a confession, so long as a rational decision remains possible." *Sturdivant*, 796 F.3d at 697 (citing *Conner v. McBride,* 375 F.3d 643, 653 (7th Cir. 2004)); see also *United States v. Villalpando,* 588 F.3d 1124, 1128 (7th Cir. 2009) (noting that "while a false promise of leniency may render a statement involuntary, police tactics short of the false promise are usually permissible"); *States v. Kontny,* 238 F.3d 815, 817 (7th Cir. 2001) ("Trickery, deceit, even

---

[8] Defendant contends that agents used coercive tactics because they failed to correct his mistaken impression that he was not a subject of criminal investigation. [97, at 10.] Not so. The Court's voluntariness inquiry is objective and therefore Defendant's subjective mistaken impression is immaterial. *United States v. Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015) (citation omitted). Only what a "reasonable person" in his position would believe is important for this analysis. *Id.*

16

impersonation do not render a confession inadmissible, certainly in noncustodial situations and usually in custodial ones as well, unless government agents make threats or promises.").

Here, the interview was noncustodial, and the agents' tactics fell short of threats or promises. *Kontny,* 238 F.3d at 817. Agents told Defendant that it would be better to acknowledge that he "screwed up," that "people make mistakes," and that people often make "decisions that aren't necessarily ethical or legal." [Tr. 51–52, at 46:40–48:12; Tr. 53–54, at 49:35–50:16.] None of these statements are false promises or threats. *Villalpando,* 588 F.3d at 1128; *Kontny,* 238 F.3d at 817.

Considering the totality of the circumstances, a reasonable person in Defendant's position would recognize that agents were interrogating him for potential criminal liability. *Gillaum,* 372 F.3d at 856. Law enforcement came to interview Defendant on his business's federal loan. Agents were persistent in requesting an opportunity to talk with Defendant. Agents proceeded to go through details of the loan, noting mistakes and errors, commenting that they might not be coincidental. [See Tr. 1, at 00:03–00:06; Tr. 1–2, at 00:18–00:23; Tr. 12, at 08:34–09:32; Tr. 17, at 14:59–15:05; Tr. 21, at 18:20–18:27; Tr. 27, at 23:20–23:25; Tr. 34, at 31:15–31:36; Tr. 36, at 32:21–32:25; Tr. 51–52, at 46:55–48:12.] Even Defendant recognized that he might be in legal trouble. He stated "at least four times" that he'd prefer to have his attorney present. [97-1, at 1.] During his conversation with agents, Defendant disclaimed any intent to defraud the government twice [Tr. 24, at 20:57–21:10; Tr. 53, at 48:28–48:35] and denied that his business's documents were not "forged or anything" [Tr. 52, at 48:05–48:10].

It is true that the agents did not expressly inform Defendant of his potential criminal liability—thought it seems that he understood that possibility. Nonetheless, this failure did not render Defendant unable to make a "rational decision" because of the clear context of the

17

conversation. *Sturdivant*, 796 F.3d at 697. Defendant's argument that agents' framing of Defendant's culpability as solely as a CEO of a business falls far short of the sort of coercion necessary to render a statement involuntary. [97, at 9.] In sum, Defendant's statement was not involuntary or violative of due process.

**IV.     Conclusion**

For the reasons stated above, Defendant's motion to suppress [97] is denied.

Dated:  November 28, 2022

_____
Robert M. Dow, Jr.
United States District Judge